# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2/25/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| In the Matter of the Search of | )  |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 3:21-mj-69 |
| Beaver Valley Self Storage, Locker 1103, 2242 Beaver Valley Rd, Fairborn, Ohio | ) Kimberly Jolson |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the  Southern  District of  Ohio , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |
| 21 USC s. 846 | conspiracy to distribute/possess with intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit of Ryan Fergot

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Ryan Fergot*
*Applicant's signature*

Ryan Fergot, SA of the DEA
*Printed name and title*

Sworn to before me and signed in my presence via facetime.

Date: February 25, 2021

*Kimberly A. Jolson*
Kimberly A. Jolson
United States Magistrate Judge

City and state: Columbus, Ohio

**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT**

I, Ryan Fergot, a Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice (hereinafter referred to as the "Affiant"), being duly sworn, deposes as follows:

**INTRODUCTION**

1. Affiant is an "Investigative or Law Enforcement Officer" of the DEA within the meaning of Title 21, United States Code, Section 878. That is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878.

2. Affiant has been a law enforcement officer since 2014. In 2014, I started at the Appleton Police Department, City of Appleton, Wisconsin. During my employment with the Appleton Police Department, your affiant was assigned to the Department's patrol division. During my time as a patrol officer, your affiant conducted retail level drug investigations and your affiant assisted the Appleton Police Department's Community Resource Unit (CRU) which included Narcotics Investigations, Prostitution and Pimping, Human Trafficking, and Criminal Street Gangs.

3. In September 2018, your affiant attended the DEA Academy which consisted of 17 weeks of training in conducting federal drug trafficking investigations, handling confidential sources, conducting undercover operations, conducting mobile, static, foot and electronic surveillance, conducting tactical entry and vehicle arrest operations, defensive tactics, firearms, and additional aspects of conducting DEA lead investigations. After completion of the basic training academy, your affiant was assigned to the Detroit Field Division, Dayton Resident Office.

1

4. Your affiant has participated in numerous narcotics investigations during the course of which your affiant has conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers. Through my training, education, and experience (including debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, and conducting surveillance on numerous occasions of individuals engaged in drug trafficking), your affiant has become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, the various ways drug money is laundered, and the efforts of persons involved in such activities to avoid detection by law enforcement.

5. Your affiant has participated in the investigation and prosecution of complex narcotics enterprises, including major drug trafficking organizations. These investigations included the use of court-ordered eavesdropping. Your affiant has also conducted extensive analyses of telephone billing records for telephones used by narcotics traffickers. Members of the Dayton Resident Office also have extensive experience in narcotics investigations, especially involving high-level narcotics traffickers and money launderers. Your affiant has had and continue to have conversations with them concerning this and other narcotics related investigations. Your affiant has worked on surveillance and enforcement teams working in conjunction with court authorized T-III intercepts. Your affiant has worked as a monitor, listening to T-III intercepts, determining minimization of intercepts, and directing surveillance and enforcement teams to take action based on T-III intercepts that your affiant monitored.

6. Along with other agents and task force officers of the DEA and other agencies, your Affiant is currently involved in an investigation into a Drug Trafficking Organization (DTO) regarding the distribution of narcotics, and conspiracy to do the same, in violation of 21

U.S.C. § 846, 841(a)(1). This Affidavit is submitted in support of an Application for a Search Warrant authorizing the search of the following premises, more particularly described in Attachment A, incorporated herein by reference, for the items described in Attachment B, incorporated herein by reference:

    a. **Beaver Valley Self Storage, Locker 1103, 2242 Beaver Valley Rd, Fairborn, Ohio** (hereinafter referred to as the "**TARGET LOCATION**").

7. As outlined below, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with the intent to distribute and to distribute controlled substances as well as conspiracy to do the same), are being committed, and that evidence, fruits, and instrumentalities of these violations, as well as contraband, as set forth more fully in Attachment B, is presently located in the **TARGET LOCATION**.

8. Affiant is familiar with the facts and circumstances described herein and makes this affidavit based upon personal knowledge derived from Affiant's participation in this investigation, conclusions affiant has reached based on Affiant's training and experience, and upon information Affiant believes to be reliable. The information contained in this Affidavit is either personally known by affiant or relayed to affiant by other law enforcement officers involved in this investigation. This affidavit does not contain all facts known to Affiant, only those necessary to establish probable cause in support of the requested search warrant.

## FACTS SUPPORTING PROBABLE CAUSE

9. Your Affiant submits, based on the facts below, that there is probable cause to believe that the **TARGET LOCATION**, as described above, is being used by a Dayton, Ohio, based fentanyl trafficking organization to store and distribute illegal narcotics as well as to collect and store drug proceeds.

10. The DEA Dayton Resident Office is currently conducting an investigation into a Dayton, Ohio area based fentanyl and methamphetamine drug trafficking organization (DTO). During this investigation, investigators identified Clemente QUEZADA (QUEZADA) as a shipment coordinator and distributor of kilogram quantities of illegal drugs within the Dayton Ohio region. Agents identified Beaver Valley Self Storage, Unit 1103, located at 2242 Beaver Valley Rd., Fairborn, Ohio (**TARGET LOCATION**) as a storage location used by QUEZADA and his DTO.

11. In late January 2021, a reliable confidential source (CS1)[1] provided information to DRO investigators in regards to an unidentified Hispanic male, only known as "ManMan", who is assisting with the distribution of large quantities of fentanyl and methamphetamine in the Dayton, Ohio region. As detailed below, investigators were able later to identify the Hispanic male as QUEZADA. Furthermore, CS1 informed investigators he/she met with QUEZADA in person and was recruited to assist with finding buyers to purchase fentanyl and methamphetamine from QUEZADA. CS1 advised QUEZADA is supposed to be getting a large shipment of illegal drugs within the next few weeks. In the interim, QUEZADA has access to a large amount of drugs that are being stored in Columbus Ohio. QUEZADA told CS1 that he/she could gain access to the drugs in Columbus, but he/she would have to go through QUEZADA to get it.

12. On or around January 26, 2021, CS1 informed investigators that QUEZADA used cellular telephone number (937) 219-9324. CS1 advised that (937) 219-9324 was the number at which he/she regularly contacted QUEZADA. On February 3, 2020, TFO Andy Leininger submitted an Administrative Subpoena to Sprint for phone toll information regarding (937) 219-

---

[1] CS1 has been proven reliable through other DEA investigations. CS1 is working for monetary consideration. CS1 CCH includes: Trafficking in Drugs, Domestic Violence and OVI.

4

9324. On the same date, CS1 conducted a recorded phone call to (937) 219-9324. The following is a transcription of the recorded phone conversation between CS1 and an individual that CS1 identified as ManMan, *i.e.,* QUEZADA:

| | |
|---|---|
| QUEZADA: | Hello |
| CS1: | What's up Poppy? |
| QUEZADA: | What's up? |
| CS1: | ManMan this is [intentionally omitted]. |
| QUEZADA: | (unintelligible) got a new number I see that. |
| CS1: | Yeah yeah you got to rotate them. |
| QUEZADA: | Yeah yeah |
| CS1: | You've been alright? |
| QUEZADA: | Yeah yeah just still waiting man. |
| CS1: | Still waiting? |
| QUEZADA: | Yeah (unintelligible) I'm gonna save this number. |
| CS1: | Ok, that Columbus thing still available? |
| QUEZADA: | Uh, uh I gotta see what's up with it. |
| CS1: | Yeah. Shouldn't be much longer, should it? |
| QUEZADA: | Na, I don't think so, I hope not. If not, they are going to have to wait until I get back. |
| CS1: | Right (overlapping conversation) did you find you a vehicle yet? |
| QUEZADA: | Na na na not yet, I'm doing that when I come back. I'm gonna mess with you on that. |
| CS1: | Ok. |
| QUEZADA: | Yeah yeah. |

5

>	CS1:		Alright, well I was just giving you my new number and checking in with you.
>
>	QUEZADA:	Alright I appreciate that.
>
>	CS1:		I'm at the house chillin, ok.
>
>	QUEZADA:	Alright

13.	After the recorded conversation, TFO Leininger conducted a debrief with CS1. CS1 stated that he/she and QUEZADA spoke in coded language during the call. CS1 advised that QUEZADA had explained that the drug shipment had not arrived yet; CS1 inquired if the drugs in Columbus were still available, to which QUEZADA indicated that he would need to check. QUEZEDA then stated that, if his shipment of drugs did not arrive soon, any drug transaction would have to wait until he gets back. CS1 believed that QUEZEDA was leaving town in the next few days, possibly to travel out of state.

14.	Additionally, on or about February 3, 2021, TFO Leininger spoke with TFO Peterson from DEA Cincinnati. TFO Peterson advised that Cincinnati DEA recently obtained information from a cooperating defendant (CD1)[2] about a Hispanic male, only known as "MeMe", later confirmed to be QUEZADA as detailed below. CD1 informed TFO Peterson that the phone number (937) 219-9324 belonged to QUEZADA. CD1 stated QUEZADA was expecting a shipment of approximately 100 pounds of methamphetamine and 20 kilograms of fentanyl, to arrive in the Dayton, Ohio, area in the next few weeks. On February 4, 2020, CD1 was shown a driver's license photo of QUEZADA, and CD1 confirmed the picture to be the individual he/she knew as "MeMe".

15.	On February 4, 2021, phone tolls from (937) 219-9324 were received from Sprint.

---

[2] CD1 is providing information for judicial consideration for charges he/she is currently facing. CD1 CCH includes: Possession of Drugs, Domestic Violence and Weapons Under Disability. DEA has been able to corroborate information from CD1 and therefore considers his information reliable.

6

Subscriber information identified "Sharmaine Turn" of 1035 Harvard Ave., Fairborn, Ohio as the subscriber of this phone. A query of local law enforcement databases and open source intelligence showed Sharmaine TURNER as recently residing at 1035 Harvard Ave., Fairborn, Ohio. Through the same databases, QUEZADA was identified as recently living at that address as well. Agents ran (937) 219-9324 through a database that law enforcement uses to track money transactions through money remitters, such as Western Union. Information was found that showed QUEZADA has regularly utilized (937) 219-9324 and his name to send money via wire transfer to Mexico. Based on training and experience, affiant knows this to be a common method for quickly laundering small amounts of drug trafficking proceeds to Mexico.

16. On February 4, 2021, DRO investigators showed a driver's license photo of QUEZADA to CS1. CS1 was given no other information, other than the photo. CS1 quickly identified the subject as QUEZADA and the individual he/she has been speaking to about illegal drug shipments.

17. On or around February 8, 2021, the DRO conducted a buy/walk operation in which QUEZADA sold 1 kilogram of fentanyl to CS1. (In the days prior to the deal, QUEZADA spoke with CS1 on several occasions via cellular telephone to arrange the transaction, and the pair ultimately agreed to conduct the deal in Beavercreek, Ohio). On or around February 8, 2021, investigators watched QUEZADA drive to various locations in, and around, Fairborn and Beavercreek, Ohio. QUEZADA finally drove to a location in Beavercreek, Ohio, where he met with CS1 and exchanged 1 kilogram of fentanyl for serialized US currency. An electronic audio/video transmitter had also been issued to CS1 by investigators for use during the deal. Through physical surveillance, CS1 confirmation, and the transmitting device, investigators were able to confirm that QUEZADA was the individual who sold CS1 the

7

kilogram of fentanyl.

18. The kilogram of fentanyl obtained from QUEZADA during the buy/walk operation was seized by your affiant, as witnessed by TFO Leininger, from CS1 following the operation. On or around February 8, 2021, TFO Barnes and TFO Hargis transported the kilogram of fentanyl to the Miami Valley Crime Lab for official testing. On or about February 11, 2021, the Miami Valley Crime Lab provided TFO Barnes with an official testing certificate, showing the kilogram of suspected fentanyl tested positive as fentanyl, and had a gross weight of 991.8 grams.

19. On or around February 9, 2021, investigators spoke with CD1 regarding QUEZADA and his DTO. CD1 indicated that, during November 2020, he/she began purchasing methamphetamine from a Mexican based DTO, which was operating in the Dayton, Ohio region. Shortly thereafter, CD1 was introduced to QUEZADA, whom was a member of the DTO. CD1 began working closely with QUEZADA by assisting with the distribution of large quantities of methamphetamine in the Dayton, Ohio region.

20. CD1 stated he/she assisted QUEZADA with acquiring a storage unit, which would be utilized to store illegal drug shipments as QUEZADA received them. CD1 advised that QUEZADA would travel to the storage unit when a shipment was received and place the drugs into the storage unit. According to CD1, to avoid suspicion from law enforcement, QUEZADA would often send co-conspirators to the storage unit to retrieve a few kilograms of the illegal drugs at a time. CD1 indicated that QUEZADA refrained from using the storage unit on a regular basis as he felt it would create suspicion if he visited it with high frequency.

21. CD1 was asked to provide information concerning the storage unit. CD1 could not remember its name. CD1, however, knew that it was in Fairborn, Ohio. While CD1 did not

recall the name of the road on which the storage locker sat, CD1 remembered the directions concerning how to reach the storage locker. Those directions matched the location of the **TARGET LOCATION**. CD1 also advised that a younger, black woman rented the storage locker for QUEZADA, but placed it under her name. CD1 could not recall the woman's name as she was an acquaintance to a friend of CD1. Based on training and experience, your Affiant knows drug traffickers commonly utilize storage facilities to store illegal drugs and/or proceeds derived from illegal drug trafficking. Additionally, it is common to utilize storage facilities that are registered under an alias, or another individual who is willing to assist with renting storage units in his/her own name, to avoid detection of law enforcement.

22. On or around February 10, 2021, your Affiant and TFO Leininger served an administrative subpoena to an employee at the **TARGET LOCATION**, requesting renter information for the facility. On February 22, 2021, the subpoenaed information was received from the **TARGET LOCATION**. Investigators reviewed the information and identified Zia POSEY (POSEY) as renting the **TARGET LOCATION** on December 22, 2020. POSEY matched the description given by CD1. According to law enforcement databases and open source intelligence, POSEY is currently residing in Springfield, Ohio.

23. Investigators were able to obtain the rental agreement between Beaver Valley Self Storage and POSEY. POSEY provided two cellular phone numbers to the storage facility: 937-831-8064 and 614-305-2074. Investigators conducted toll analysis on numerous individuals believed to be associated with QUEZADA and his DTO. 937-831-8064 had numerous contacts with cellular phone number 323-217-6259, which subscriber data is registered to Kevin HAYES, a known friend of CD1. The foregoing tends to confirm POSEY as the individual CD1 referenced as assisting QUEZADA rent a locker for drug storage.

9

24. According to information from the storage locker business, it provided POSEY an access code to a gate that controls entry to the grounds on which the **TARGET LOCATION** sits. The code was utilized on nine different dates between December 22, 2021 (date storage unit was rented) through February 22, 2021. On three of the dates -- December 22, 2020, January 2, 2021, and January 5, 2021 – it appears that individuals used the access code to enter the facility back to back to one another, but then used the access code only once to exit the facility together. For example, on January 2, 2021, the access code was utilized to enter the storage facility at 7:25 a.m. The same access code was utilized again at 7:35 a.m. At 7:39 a.m., the access code was utilized once, to leave the facility. This is indicative of one individual arriving at the location, and then a second individual arriving at the location a short time later, utilizing the same code. The two individuals appear to exit the location at the same time. Based on training and experience, your Affiant knows that this pattern of entry and exit is often indicative of drug trafficking activity. One person typically arrives before the other, retrieves illegal items (such as drugs) from the storage unit. A second person arrives moments later to take possession of the contraband, and both individuals exit the facility together.

25. On or around February 24, 2021, your affiant and TFO Leininger served an administrative subpoena on Beaver Valley Self Storage to review the video surveillance of the rental facility. We reviewed footage from January 14, 2021 and January 18, 2021 – the two most recent dates on which someone used POSEY's access code to enter the facility.

    a. The video footage from January 14, 2021 captured a black Nissan Maxima 2-door sedan, with tinted windows and a sunroof, park at the entrance keypad; the driver inputted the access code to enter the facility at 4:13 p.m. A partial Ohio license plate of "HRY" appears

10

in the footage.  The Altima then parked in front of unit 1103, *i.e.*, the **TARGET LOCATION**. A large male exited the vehicle, opened the door to the **TARGET LOCATION,** and entered the storage locker.   Shortly thereafter, the man placed an object in his car, closed the **TARGET LOCATION,** and exited the storage facility at 4:18 p.m.  It should be noted that investigators have observed QUEZADA driving a Black Altima identical to that which entered the storage facility on January 14, 2021.  Additionally, the partial plate of HRY observed on the Altima – that entered the storage facility matches the first three letters of the license plate on QUEZADA's Altima – namely, HRY2095.  Additionally, the appearance of the man driving the car on January 14, 2021 matched that of QUEZADA.   Based on the totality of these circumstances, I believe that QUEZADA accessed the **TARGET LOCATION** on January 14, 2021.

        b.    Video footage from January 18, 2021 captured similar events. QUEZADA's vehicle arrived at the facility and its driver – a man who matched QUEZADA's physical description – inputted the access code around 3:08 p.m.   The car proceeded to the **TARGET LOCATION,** where the driver retrieved an item from within the **TARGET LOCATION**.  The driver then placed the item in the vehicle, closed the door to the **TARGET LOCATION,** and left the storage facility at 3:11 p.m.  Again, I believe that QUEZADA accessed the **TARGET LOCATION** on this day.

    26.    On or around February 18, 2021, the DRO utilized CS1 to conduct a meeting with QUEZADA in Fairborn, Ohio.  CS1 was equipped with an electronic recording/monitoring device prior to the meeting.  During this encounter, which investigators monitored, CS1 provided QUEZADA with money in partial payment for the kilogram of fentanyl that he had delivered earlier in the month.  QUEZADA informed CS1 that he anticipated a large shipment of fentanyl

and methamphetamine would arrive in the Dayton, Ohio area on or around February 26, 2021.

27. After the controlled buy/walk operation, your Affiant and TFO Leininger debriefed with CS1. CS1 advised that, based on previous dealing with QUEZADA, QUEZADA would personally coordinate and handle a drug shipment of that size. CS1 further opined that QUEZADA likely would keep the drugs at a storage facility until he could find buyers for them.

28. Based on the foregoing, I believe that QUEZADA is using the **TARGET LOCATION** to store controlled substances as well as the proceeds therefrom. Based on the controlled delivery of fentanyl as well as QUEZADA's conversations with CS1, I know that QUEZADA is actively engaged in the sale and distribution of bulk amounts of drugs in the Dayton, Ohio area. I also know, based on my training and experience, that drug traffickers frequently use storage lockers placed in the name of other individuals as locations to safeguard and maintain illegal drugs and the proceeds therefrom. Information from CD1 confirms that QUEZADA actively used a storage locker in Fairborn, Ohio as part of his drug trafficking operation. While CD1 did not know the address of the storage facility, the directions that CD1 provided placed it at the **TARGET LOCATION.** Moreover, CD1's description of a black female who rents the location for QUEZADA matches that of POSEY. Video footage from recent entries to the **TARGET LOCATION** further confirm QUEZADA's link to this location. Given the totality of the circumstances contained in this affidavit, I believe that QUEZADA currently is using the **TARGET LOCATION** for his drug trade.

29. Based on my training, experience, participation in other drug investigations, my participation in this investigation, and my discussions with other experienced agents and officers of the DEA, and other federal state, and local law enforcement officers, your affiant has learned:

    a. That narcotics traffickers, such as those who deal in distribution quantities of fentanyl frequently maintain at their residence, place of business or other

12

secure premises to which they have access, amounts of fentanyl and amounts of currency in order to maintain and finance their ongoing narcotics business;

b. That narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, including cocaine.  Furthermore, your Affiant from experience that the aforementioned books, records, receipts, notes, ledgers, etc., are generally maintained where the traffickers have ready access to them;

c. That narcotics traffickers use and maintain electronic devices in furtherance of their illegal activities, to include but not limited to, mobile telephones, computers, paging devices, answering machines, police scanners and money counters to facilitate their criminal activity.

d. That it is common for drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence or place of business, for ready access and to conceal same from law enforcement authorities;

e. That persons involved in drug trafficking conceal proceeds of drug sales, records of drug transactions, firearms, ammunition, cashes of drugs, large amounts of currency, financial instruments, keys to safe deposits boxes, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and/or evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from narcotics trafficking in their residences and in other secure locations including places of business in order to conceal them from law enforcement authorities;

f. That narcotics traffickers commonly maintain records of telephone calls in billing statements, addresses or telephone numbers in books or papers which reflect names, addresses and telephone numbers of their associates in their narcotics trafficking organization, as well as photographs of themselves and their drug trafficking associates;

g. That traffickers in controlled substances, namely cocaine, commonly keep paraphernalia for the packaging, weighing, processing, and distributing cocaine.  That these paraphernalia include but are not limited to scales, plastic bags, baggies, heat sealers, and other utensils used to distribute cocaine;

h. That your Affiant is aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, in particular, trafficking in a controlled substance.

i. That traffickers utilize vehicles to transport and conceal narcotics, and to conduct transactions inside of vehicles, out of the view of the public eye.

    j.    That traffickers frequently maintain firearms and weapons to protect both the controlled substances and proceeds derived from their sales. Drug traffickers maintain firearms as a use of force, or threat of force, against rival drug dealers and/or delinquent customers.

## CONCLUSION

25.    Based on the information above, your Affiant submits that there is probable cause to believe that the specified federal offenses have been committed and that a search of the **TARGET LOCATION** will lead to the discovery of the items outlined above (described more fully in Attachment B, incorporated by reference herein), which items constitute evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) (possession with the intent to distribute and to distribute controlled substances and conspiracy to do the same).

26.    Your affiant therefore, respectfully requests that the attached warrant be issued authorizing the search of the **TARGET LOCATION.**

## REQUEST FOR SEALING

27.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature

14

disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

                         Respectfully submitted,

                         *Ryan Fergot*
                         Ryan Fergot, Special Agent
                         Drug Enforcement Administration

Subscribed and sworn to before me on February 25th 2021.

*Kimberly A. Jolson*
Kimberly A. Jolson
United States Magistrate Judge

15

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched is:

a.	<u>2242 Beaver Valley Road, Fairborn, Ohio, Unit 1103</u> **Target Residence** is a storage facility located in Fairborn, Ohio that has brown walls, green metal doors and a green roof, the numerals "1103" are located above the garage style door.





## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. Cellular telephones, including all associated telephone records and stored electronic data that may be used in the commission of these offenses;

G. United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

H. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

I. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

J. Illegal drugs and other materials, paraphernalia and/or equipment and tools used in the drug trade, including heat sealing equipment.

K. Firearms and ammunition.